T.C. Memo. 2005-252

UNITED STATES TAX COURT

JACOB R. RAMSBURG, JR. AND NORMA J. RAMSBURG, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6140-03.                    Filed October 31, 2005.

<u>David Samuel De Jong</u> and <u>Frank W. Dunham III</u>, for
petitioners.

<u>Roger W. Bracken</u> and <u>Ann Welhaf</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined deficiencies of

$69,505, $18,717, and $120,737 in petitioners' Federal income tax

(tax) for 1996, 1997, and 1998, respectively.

The only issue remaining for decision[1] is whether section 469(g)(1)[2] permits petitioners to treat for 1998 certain losses from a passive activity (passive losses) as losses not from a passive activity (nonpassive losses).[3] We hold that it does not.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time petitioners filed the petition in this case, they resided in Thurmont, Maryland.

Petitioner Jacob R. Ramsburg, Jr. (Mr. Ramsburg) and Carroll K. Stottlemeyer (Mr. Stottlemeyer) have been friends since they were children. In 1972, Mr. Ramsburg hired Mr. Stottlemeyer to work for Frederick Underwriters, Inc. (Frederick Underwriters), a corporation 94 percent to 96 percent of whose stock Mr. Ramsburg owned at all relevant times. In 2004, Mr. Stottlemeyer retired.

---

[1]Petitioners and respondent agree that the Court's resolution of the issue remaining for decision will resolve whether petitioners are entitled to a net operating loss (NOL) deduction for each of the years 1996 and 1997 that is attributable to an alleged NOL carryback from 1998. There also are other questions relating to certain determinations in the notice of deficiency (notice) that are computational in that their resolution flows automatically from our resolution of the issue that we address herein.

[2]All section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

[3]As discussed below, petitioners had both ordinary passive losses and sec. 1231 passive losses. For convenience, we shall sometimes refer collectively to petitioners' ordinary passive losses and sec. 1231 passive losses as petitioners' passive losses.

In 1980, Mr. Ramsburg suggested to Mr. Stottlemeyer that they form a partnership that would engage in the horse business. Mr. Ramsburg made that suggestion in order to, inter alia, help Mr. Stottlemeyer who was having family problems. On September 15, 1980, Mr. Ramsburg and Mr. Stottlemeyer formed a general partnership known as Kildare Timmy (Kildare Timmy). The partnership agreement that they signed with respect to Kildare Timmy (Kildare Timmy partnership agreement) provided:

### PARTNERSHIP AGREEMENT

This Partnership Agreement is dated September 15, 1980, between Carroll K. Stottlemeyer (Scotty) and J. R. Ramsburg Jr. (JR) hereafter known as partners.

Scotty is actively involved in the business of training and racing standard bred horses. JR wants to invest some money and become involved in this business. Accordingly, Scotty and JR have agreed to the following terms of their partnership:

The partnership name will be called KILDARE TIMMY.

Scotty and JR will each own 50% of the assets, liabilities and capital interest of the partnership.

Scotty and JR will each receive 50% of the profits of the partnership.

Losses incurred by the partnership will be allocated to the partners based upon cash contributed to the partnership. The partner that contributes the cash to the partnership or guarantees partnership debt so that the partnership can incur the losses will receive the benefit of the losses.

Scotty will keep the checkbook and will handle the day-to-day management of the partnership.

The partnership address will be 1201 East Street, Frederick, Maryland.

When Kildare Timmy was formed, its business activities, except for some minor horse breeding activities, were limited to racing horses. At all relevant times, Kildare Timmy hired trainers, including Dane Snyder and Dave Dempster (Kildare Timmy's trainers), to maintain, care for, and train its race-horses at stables located in Washington, Pennsylvania.

In 1986, Kildare Timmy became more involved in horse breeding activities. At all relevant times, Kildare Timmy's broodmares were maintained and cared for by Mr. Ramsburg at stables located on his farm in Thurmont, Maryland.

At all relevant times until at least 1995, Mr. Stottlemeyer generally performed day-to-day management services for Kildare Timmy (Mr. Stottlemeyer's management services). Those services included attending horse sales, selecting horses to buy, and dealing with Kildare Timmy's trainers. In return for Mr. Stottlemeyer's management services, Mr. Stottlemeyer did not receive any salary from Kildare Timmy or increases in his Kildare Timmy capital account.

During at least 1987 through 1996, Mr. Stottlemeyer made cash capital contributions to Kildare Timmy totaling nearly $300,000 (i.e., approximately $282,187). He made most of those contributions from the salary that he received as an employee of

Frederick Underwriters.[4]  From at least 1986 through 1997, Mr.
Ramsburg made cash capital contributions to Kildare Timmy total-
ing approximately $1,336,459.  The total amount of Mr. Ramsburg's
cash capital contributions included $283,500 that, as found
below, he borrowed from Frederick Underwriters and contributed to
Kildare Timmy.  On January 1, 1998, the date on which Kildare
Timmy distributed all of its assets to Mr. Ramsburg (discussed
below), Mr. Stottlemeyer did not own a 50-percent capital inter-
est in Kildare Timmy.

On November 1, 1992, Frederick Underwriters made two loans
in the amounts of $140,000 and $143,500, respectively, to Mr.
Ramsburg in his individual capacity and not in his capacity as a
general partner of Kildare Timmy (collectively, Frederick Under-
writers' 1992 loans to Mr. Ramsburg).  On that date, Mr. Ramsburg
signed in his individual capacity and not in his capacity as a
general partner of Kildare Timmy two promissory notes payable to
Frederick Underwriters in the amounts of $140,000 and $143,500,
respectively, that evidenced such respective loans.  (We shall
refer collectively to that $140,000 promissory note and that
$143,500 promissory note as Mr. Ramsburg's 1992 notes.)  Each of
Mr. Ramsburg's 1992 notes provided for interest at the annual

---

[4]In order to make cash capital contributions to Kildare
Timmy, Mr. Stottlemeyer directed Frederick Underwriters to
transfer on his behalf certain amounts of his salary to Kildare
Timmy.

rate of 3.61 percent to be paid annually commencing on December 31, 1992, and for the entire principal balance and any accrued and unpaid interest to be paid on October 30, 1995. Mr. Ramsburg transferred the proceeds of Frederick Underwriters' 1992 loans to Mr. Ramsburg to Kildare Timmy as capital contributions.[5]

_____

[5]The parties stipulated that the "treatment of the Frederick [Underwriters' 1992] loans [to Mr. Ramsburg] on the partnership's balance sheet was unchanged until the partnership terminated in 1998" and that "At the end of 1997, the Frederick [Underwriters' 1992] loans [to Mr. Ramsburg] remained unpaid." Those stipulations are contrary to certain checklists (discussed below) used by Keller Bruner and Company (Keller Bruner), the certified public accounting firm employed by Kildare Timmy and petitioners in preparing the tax returns for Kildare Timmy and petitioners. (We shall hereinafter refer to the checklists used by Keller Bruner as the Keller Bruner checklists.) As found below, Mr. Ramsburg's 1992 notes and Frederick Underwriters' 1992 loans to Mr. Ramsburg were not outstanding, according to the Keller Bruner checklists, at the end of 1997 or on the next day (i.e., Jan. 1, 1998) on which Kildare Timmy distributed all of its assets to Mr. Ramsburg. According to the Keller Bruner checklists, in 1995 Frederick Underwriters' 1992 loans to Mr. Ramsburg were paid in full and refinanced by two new loans that Frederick Underwriters made to Mr. Ramsburg in the amounts of $140,000 and $143,500, respectively, and that were evidenced by two promissory notes, each providing for interest at the annual rate of 5.79 percent and a maturity date of Oct. 30, 1998. (We shall hereinafter refer to those 1995 loans and those 1995 promissory notes as Frederick Underwriters' 1995 loans to Mr. Ramsburg and Mr. Ramsburg's 1995 notes, respectively.) In their stipulations of fact, petitioners and respondent disregard the information shown in the Keller Bruner checklists and treat Frederick Underwriters' 1992 loans to Mr. Ramsburg and Mr. Ramsburg's 1992 notes as outstanding at the end of 1997 and on the next day (i.e., Jan. 1, 1998) on which Kildare Timmy distributed all of its assets to Mr. Ramsburg. We presume that they do so because they believe that the material facts (e.g., the loan principal amount, the identity of the debtor, the identity of the creditor) surrounding both Frederick Underwriters' 1992 loans to Mr. Ramsburg and Frederick Underwriters' 1995 loans to Mr. Ramsburg are the same. Moreover, petitioners do not contend, and in any event petitioners have

(continued...)

Kildare Timmy did not execute a note with respect to either of the Frederick Underwriters' 1992 loans to Mr. Ramsburg. Kildare Timmy did not make any payments of principal to Mr. Ramsburg or Frederick Underwriters with respect to either of such loans.

On December 31, 1994, Mr. Stottlemeyer executed a document entitled "NOTE" (Mr. Stottlemeyer's note)[6] that provided in pertinent part:

> I Carroll K. Stottlemeyer, after date, FOR VALUE RECEIVED, the Undersigned, jointly and severally, promise to pay to the order of Jacob R. Ramsburg Jr., the lesser of my share of cash proceeds from disposition of horses owned by the entity known as Kildare Timmy or the sum of one hundred fourty six thousand seven hundred and fifty Dollars payable at the offices of Frederick Underwriters, with interest from date at the rate of 0% per annum.  [Reproduced literally.]

---

[5](...continued)
failed to carry their burden of showing, that Frederick Underwriters did not make the Frederick Underwriters' 1995 loans to Mr. Ramsburg in his individual capacity, that Mr. Ramsburg did not sign Mr. Ramsburg's 1995 notes in his individual capacity, and that he did not transfer the proceeds of Frederick Underwriters' 1995 loans to Mr. Ramsburg to Kildare Timmy as capital contributions.  In any event, whether (1) Frederick Underwriters' 1992 loans to Mr. Ramsburg and Mr. Ramsburg's 1992 notes or (2) Frederick Underwriters' 1995 loans to Mr. Ramsburg and Mr. Ramsburg's 1995 notes were outstanding at the end of 1997 and on the next day (i.e., Jan. 1, 1998) on which Kildare Timmy distributed all of its assets to Mr. Ramsburg does not affect our findings and conclusions herein.  For convenience, we shall hereinafter refer only to Frederick Underwriters' 1992 loans to Mr. Ramsburg and Mr. Ramsburg's 1992 notes.

[6]By using the term "Mr. Stottlemeyer's note", we do not intend to suggest that for tax purposes there was a loan by Mr. Ramsburg to Mr. Stottlemeyer.

Mr. Stottlemeyer's note did not specify any date(s) on which Mr. Stottlemeyer was to make any payment(s) thereunder.

At a time not disclosed by the record before petitioners' taxable year 1996, Mr. Ramsburg began operating as a sole proprietorship a horse-racing business under the name Troy McDougal (Mr. Ramsburg's sole proprietorship).[7]  Mr. Ramsburg's sole proprietorship raced two- and three-year old horses.  Mr. Ramsburg's sole proprietorship sold the three-year old horses that he raced after the racing season ended.  At all relevant times, Mr. Ramsburg's sole proprietorship retained Dan Altmeyer (Mr. Altmeyer) to serve as the trainer for its horses.  In return for his services, Mr. Ramsburg's sole proprietorship gave Mr. Altmeyer a one-third interest in any horses that it purchased (Mr. Ramsburg's sole proprietorship's horses).  At all relevant times, Mr. Altmeyer trained Mr. Ramsburg's sole proprietorship's horses for half a year in Florida and for half a year in Pennsylvania.

Beginning in 1995, Mr. Stottlemeyer became ill and was diagnosed with a brain tumor.  In the spring of 1995, Mr. Stottlemeyer underwent surgery, which was followed by a long recovery period.  During the period Mr. Stottlemeyer was recovering, Mr. Ramsburg assumed Mr. Stottlemeyer's day-to-day manage-

_____

[7]At a time not disclosed by the record during petitioners' taxable year 1998, the name of Mr. Ramsburg's sole proprietorship was changed from Troy McDougal to J R Ramsburg Stables.

ment role for Kildare Timmy.

At a time in 1996 or 1997 not disclosed by the record, but before December 8, 1997, Mr. Stottlemeyer concluded, and informed Mr. Ramsburg, that Mr. Stottlemeyer should withdraw from Kildare Timmy because he no longer was able to perform Mr. Stottlemeyer's management services for that partnership. Thereafter, Mr. Stottlemeyer and Mr. Ramsburg decided to terminate Kildare Timmy.

On December 8, 1997, Mr. Ramsburg gave Mr. Stottlemeyer a letter outlining the terms of the termination of Kildare Timmy (Kildare Timmy termination agreement), which Mr. Stottlemeyer signed on that date. The Kildare Timmy termination agreement provided in pertinent part:

> In view of all that is going on in your life, I can understand your not wanting to continue in the horse business, and understand that you are unable to make a capital contribution this year. I know that you have not been able to make a 50-50 capital contribution since 1991, but felt that your contribution to the daily operations was sweat equity. I believe now is the time to consider changing our partnership arrangement from 50-50. I would like to make the following offer to you:
>
> 1) The partnership will purchase no more horses.
> 2) We will wind up the business of the partnership by the end of this year, and I will assume all responsibility for the checking account at Frederick County National Bank.
> 3) On January 1, 1998, I will purchase all of the horses and equipment owned by us jointly at book value and have them transferred during 1998 to my name individually.
> 4) I will assume all of the liabilities owed by us as a result of the horse racing and breeding done by the Kildare Timmy partnership.

On January 1, 1998, Kildare Timmy distributed all of its assets to Mr. Ramsburg, including 7 race horses and 12 breeding horses (sometimes referred to collectively as racing and breeding horses),[8] the balance (i.e., $908.71) in Kildare Timmy's bank account (Kildare Timmy bank account balance), and certain stud rights known as Cams Card Skark stallion interest (stud rights). Neither Kildare Timmy nor its partners obtained an appraisal of the racing and breeding horses and the stud rights that Kildare Timmy distributed to Mr. Ramsburg upon termination of that partnership.

On or about the date on which Kildare Timmy distributed all of its assets to Mr. Ramsburg, Mr. Ramsburg repaid with his personal funds the Frederick Underwriters' 1992 loans to Mr. Ramsburg.

After the termination of Kildare Timmy, Mr. Ramsburg continued operating Mr. Ramsburg's sole proprietorship. For at least part of 1998, Mr. Ramsburg used in Mr. Ramsburg's sole proprietorship all 19 of the racing and breeding horses that Kildare Timmy had distributed to him. In 1998, Mr. Ramsburg sold 9 of those racing and breeding horses, and Mr. Ramsburg's sole propri-

---

[8]The names of the racing and breeding horses that Kildare Timmy distributed to Mr. Ramsburg were: Idealists Hanover, Happening Hanover, Rare Guy, Brief Wars, Justen's Western, Bar B Wars, Overture Hanover, Overture Siera, Vidalita Hanover, Western Skylark, Yankee Skylark, Northern Crush, Tarport Reactor, Yankee Bardot, Western Shuffle, Pizzacato, Yankee Shuffle, Yankee Goddess, and Rock Legend.

etorship continued using the remaining 10 such horses in its business.  As discussed below, petitioners reported in their 1998 tax return the following gain or loss on the sale of those nine horses:

| Horses | Gain or (Loss) |
|---|---|
| Idealists Hanover | ($1,839) |
| Brief Wars | 2,129 |
| Western Skylark | 129 |
| Rare Guy | (3,779) |
| Overture Siera | (3,319) |
| Happening Hanover | (2,883) |
| Yankee Skylark | 1,199 |
| Overture Hanover | (911) |
| Vidalita Hanover | (2,267) |

In 1999, Mr. Ramsburg sold three additional racing and breeding horses that Kildare Timmy had distributed to him, and Mr. Ramsburg's sole proprietorship continued using the remaining seven such horses in its business.  As discussed below, petitioners reported in their 1999 tax return the following gain or loss on the sale of those three horses:[9]

| Horses | Gain or (Loss) |
|---|---|
| Bar B Wars | ($2,067) |
| Justen's Western | 58,933 |
| Western Shuffle | 30,301 |

In 2002, Mr. Ramsburg sold three additional racing and breeding horses that Kildare Timmy had distributed to him.  As discussed below, petitioners reported in their 2002 tax return

---

[9]See infra note 16.

the following gain or loss on the sale of those three horses:

| Horses | Gain or (Loss) |
|---|---|
| Northern Crush | ($2,578) |
| Tarport Reactor | (885) |
| Yankee Bardot | $1,055 |

For each of the taxable years 1986 through 1998, Kildare Timmy, which used a taxable year ending December 31, timely filed Form 1065, U.S. Partnership Return of Income (partnership return), which Mr. Ramsburg signed as a general partner. Kildare Timmy employed Keller Bruner to prepare those returns. In preparing those returns, Dawson Grove and Brian Rippeon (Mr. Rippeon), who worked for Keller Bruner, relied on information and representations that Mr. Ramsburg and/or Mr. Stottlemeyer provided to them.

The respective partnership returns that Kildare Timmy filed for the years 1986 through 1998, including certain schedules included as part of those returns, showed, inter alia, the following with respect to Kildare Timmy and with respect to Mr. Ramsburg and Mr. Stottlemeyer:

| Year | Ordinary income (loss) from trade or business activities | Capital account at beginning of year | | Capital contributed during year | | Distributive share of ordinary income (loss) from trade or business activities | | Net gain (loss) under section 1231 | | Withdrawals and distributions | | Capital account at end of year | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Kildare Timmy | R[1] | S[2] | R | S | R | S | R | S | R | S | R | S |
| 1986 | ($16,387) | $1,193 | $1,193 | $21,102 | $0 | ($16,387) | $0 | $0 | $0 | $0 | $0 | $5,908 | $1,193 |
| 1987 | (42,504) | 5,908 | 1,193 | 55,100 | 25,000 | (29,735) | (12,769) | (2,478) | (1,061) | 0 | 0 | 28,795 | 12,363 |
| 1988 | (85,199) | 28,795 | 12,363 | 25,560 | 25,160 | (42,600) | (42,600) | 0 | 0 | 0 | 0 | 11,755 | (5,077) |
| 1989 | (3,448) | 11,755 | (5,077) | 15,370 | 15,250 | (1,724) | (1,724) | 0 | 0 | 5,500 | 5,500 | 24,071 | 7,119 |
| 1990 | (74,929) | 24,071 | 7,119 | 24,000 | 24,000 | (37,464) | (37,465) | (4,285) | (4,285) | 0 | 0 | 12,172 | (4,781) |
| 1991 | (194,535) | 12,172 | (4,781) | 33,562 | 33,562 | (97,268) | (97,267) | (4,992) | (4,991) | 0 | 0 | (56,525) | (73,478) |
| 1992 | (203,170) | (56,526) | (73,478) | 195,793 | 34,292 | (172,898) | (30,272) | (18,423) | (3,226) | 0 | 0 | (52,054) | (72,684) |
| 1993 | (202,647) | (52,054) | (72,684) | 171,898 | 30,297 | (172,250) | (30,397) | (5,465) | (964) | 0 | 0 | (57,871) | (73,748) |
| 1994 | (172,298) | (57,871) | (73,748) | 157,798 | 30,297 | (144,541) | (27,757) | (2,920) | (561) | 0 | 0 | (47,534) | (71,769) |
| 1995 | (215,002) | (47,534) | (71,769) | 184,332 | 30,832 | (184,192) | (30,810) | 5,313 | 889 | 0 | 0 | (42,081) | (70,858) |
| 1996 | (130,806) | (42,081) | (70,858) | 104,497 | 33,497 | (99,059) | (31,747) | (2,071) | (664) | 0 | 0 | (38,714) | (69,772) |
| 1997 | (153,819) | (38,714) | (69,772) | 63,947 | 0 | (153,819) | 0 | (14,983) | 0 | 0 | 0 | (143,569) | (69,772) |
| 1998 | (4,592) | (143,569) | (69,772) | 283,500 | 0 | (4,592) | 0 | 0 | 0 | 65,567 | 0 | 0 | 0 |

[1]R refers to Mr. Ramsburg.
[2]S refers to Mr. Stottlemeyer.

Included as part of the 1998 partnership return for Kildare Timmy's short and final taxable year was Schedule K-1, Partner's Share of Income, Credits, Deductions, Etc. (Schedule K-1), relating to Mr. Ramsburg.  A statement (explanatory statement relating to Mr. Ramsburg's Schedule K-1) entitled "Schedule K-1, Column C Reconciliation" purported to explain how the amount shown for 1998 (i.e., a loss of $4,592)[10] in Item J, Column (c) of such Schedule K-1 (i.e., Partner's share of lines 3, 4, and 7, Form 1065, Schedule M-2) was calculated.  The explanatory statement relating to Mr. Ramsburg's 1998 Schedule K-1 showed the following:

| Description | Amount |
|---|---|
| Ordinary Income (Loss) | ($4,592) |
| Loss on Disposition[1] | (69,772) |
| Total to Schedule K-1, Item J, Column C | (74,364) |

[1]The explanatory statement relating to Mr. Ramsburg's Schedule K-1 did not provide any details about "Loss on Disposition".

Included as part of the 1998 partnership return was Schedule K-1 relating to Mr. Stottlemeyer.  A statement (explanatory statement relating to Mr. Stottlemeyer's Schedule K-1) entitled "Schedule K-1, Column C Reconciliation" purported to explain how the amount shown for 1998 (i.e., $0) in Item J, Column (c) of such Schedule K-1 (i.e., Partner's share of lines 3, 4, and 7,

[10]The loss of $4,592 is the amount shown in the chart above as Mr. Ramsburg's distributive share of ordinary loss from trade or business activities.

Form 1065, Schedule M-2)[11] was calculated.  The explanatory

statement relating to Mr. Stottlemeyer's 1998 Schedule K-1 showed

the following:

| Description | Amount |
|---|---|
| Gain on Disposition[1] | $69,772 |
| Total to Schedule K-1, Item J, Column C | 69,772 |

[1]The explanatory statement relating to Mr. Stottlemeyer's
Schedule K-1 did not provide any details about "Gain on Disposi-
tion".

The 1998 partnership return included Form 4797, Sales of

Business Property (Form 4797).  In Part III of that form, Gain

From Disposition of Property Under Sections 1245, 1250, 1252,

1254, and 1255, Kildare Timmy claimed the following with respect

to the racing and breeding horses that it distributed to Mr.

Ramsburg:

---

[11]The amount of $0 is the amount shown in the chart above as
Mr. Stottlemeyer's distributive share of ordinary income or loss
from trade or business activities.

| Horse | Date acquired | Date sold | Gross sales price | Cost or other basis plus expense of sale | Depreciation allowed or allowable | Adjusted basis | Total gain |
|---|---|---|---|---|---|---|---|
| Yankee Goddess | 10/02/88 | 01/01/98 | $0 | $16,000 | $16,000 | $0 | $0 |
| Rock Legend | 10/17/88 | 01/01/98 | 0 | 10,000 | 10,000 | 0 | 0 |
| Yankee Shuffle | 10/01/89 | 01/01/98 | 0 | 5,000 | 5,000 | 0 | 0 |
| Yankee Skylark | 09/30/90 | 01/01/98 | 0 | 15,000 | 15,000 | 0 | 0 |
| Yankee Bardot | 09/15/91 | 01/01/98 | 398 | 13,000 | 12,602 | 398 | 0 |
| Tarport Reactor | 11/24/92 | 01/01/98 | 3,411 | 16,000 | 12,589 | 3,411 | 0 |
| Idealists Hanover | 11/15/94 | 01/01/98 | 4,339 | 9,500 | 5,161 | 4,339 | 0 |
| Pizzacato | 01/16/95 | 01/01/98 | 3,405 | 7,000 | 3,595 | 3,405 | 0 |
| Brief Wars | 03/13/95 | 01/01/98 | 2,121 | 4,360 | 2,239 | 2,121 | 0 |
| Western Skylark | 04/24/95 | 01/01/98 | 2,202 | 4,240 | 2,038 | 2,202 | 0 |
| Northern Crush | 10/29/95 | 01/01/98 | 7,017 | 12,000 | 4,983 | 7,017 | 0 |
| Rare Guy | 10/02/95 | 01/01/98 | 5,029 | 8,600 | 3,571 | 5,029 | 0 |
| Overture Hanover | 02/01/95 | 01/01/98 | 911 | 1,875 | 964 | 911 | 0 |
| Bar B Wars | 04/08/96 | 01/01/98 | 7,090 | 10,570 | 3,480 | 7,090 | 0 |
| Western Shuffle | 04/08/96 | 01/01/98 | 2,705 | 4,320 | 1,615 | 2,705 | 0 |
| Justen's Western | 05/13/96 | 01/01/98 | 2,655 | 4,240 | 1,585 | 2,655 | 0 |
| Overture Siera | 09/25/96 | 01/01/98 | 3,319 | 5,300 | 1,981 | 3,319 | 0 |
| Happening Hanover | 11/26/96 | 01/01/98 | 3,883 | 6,200 | 2,317 | 3,883 | 0 |
| Vidalita Hanover | 11/26/96 | 01/01/98 | 3,883 | 6,200 | 2,317 | 3,883 | 0 |

In Part III of Form 4797 included in the 1998 partnership return, Kildare Timmy also claimed the following with respect to the sale of the stud rights that Kildare Timmy distributed to Mr. Ramsburg:

| Date acquired | Date sold | Gross sales price | Cost or other basis plus expense of sale | Depreciation allowed or allowable | Adjusted basis | Total gain |
|---|---|---|---|---|---|---|
| 01/13/95 | 01/01/98 | $12,160 | $25,000 | $12,840 | $12,160 | $0 |

In preparing each of the respective partnership returns for

the years 1990 through 1998, Keller Bruner used the Keller Bruner checklist.[12]  The Keller Bruner checklist showed for each of the years 1992 through 1997, inter alia, the following with respect to various claimed notes payable to Frederick Underwriters by Kildare Timmy:[13]

| Year | Notes payable | Amount |
|---|---|---|
| 1992 Keller Bruner checklist | N/P Frederick Underwriters Dated 11-1-92 @ 3.61% Due 10-30-95 from JR only[1] | $140,000 |
| | N/P Frederick Underwriters Dated 11-1-92 @ 3.61% Due 10-30-95 from JR only[1] | 143,500 |
| 1993 Keller Bruner checklist | N/P Frederick Underwriters Dated 11-1-92 @ 3.61% Due 10-30-95 from JR only | 140,000 |
| | N/P Frederick Underwriters Dated 11-1-92 @ 3.61% Due 10-30-95 from JR only | 143,500 |
| 1994 Keller Bruner checklist | N/P Frederick Underwriters Dated 11-1-92 @ 3.61% Due 10-30-95 from JR only | 140,000 |
| | N/P Frederick Underwriters Dated 11-1-92 @ 3.61% Due 10-30-95 from JR only | 143,500 |
| 1995 Keller Bruner checklist | N/P Frederick Underwriters Dated 11-1-95 @ 5.79% Due 10-30-98 from JR only | 140,000 |
| | N/P Frederick Underwriters Dated 11-1-95 @ 5.79% Due 10-30-98 from JR only | 143,500 |
| 1996 Keller Bruner checklist | N/P Frederick Underwriters Dated 11-1-95 @ 5.79% Due 10-30-98 from JR only | 140,000 |
| | N/P Frederick Underwriters Dated 11-1-95 @ 5.79% Due 10-30-98 from JR only | 143,500 |
| 1997 Keller Bruner checklist | N/P Frederick Underwriters Dated 11-1-95 @ 5.79% Due 10-30-98 from JR only | 140,000 |
| | N/P Frederick Underwriters Dated 11-1-95 @ 5.79% Due 10-30-98 from JR only | 143,500 |

[1]It is not altogether clear what was intended by the use of the phrase "from JR only" that appeared in the Keller Bruner checklist for each of the years 1992 through 1997.  In any event, we have found that Mr. Ramsburg, in his individual capacity and not in his capacity as a general partner of Kildare Timmy, borrowed the money in question and then contributed such money to Kildare Timmy as a capital contribution.

_____

[12]For each of the years 1990 through 1993, the Keller Bruner checklist was called "**Partnership Return Of Income Checklist**".  For each of the years 1994 through 1998, the Keller Bruner checklist was called "**Partnership (or LLC) Return Of Income Checklist**".

[13]See supra note 5.

Petitioners jointly filed Form 1040, U.S. Individual Income Tax Return (Form 1040), for their taxable year 1998 (1998 return).[14] Petitioners' 1998 return showed, inter alia, taxable income of $0 and total tax of $0. In calculating the taxable income of $0 reported in petitioners' 1998 return, petitioners claimed, inter alia, a loss of $809,668 in Schedule E, Supplemental Income and Loss (Schedule E), included as part of that return. Such claimed loss included a nonpassive loss of $784,668, which was shown in Schedule E as resulting from the "ENTIRE DISPOSITION OF [A] PASSIVE ACTIVITY" conducted by Kildare Timmy.

Petitioners' 1998 return included Form 4797, Sales of Business Property (petitioners' 1998 Form 4797). In Part I of that form (Form 4797, Part I), Sales or Exchanges of Property Used in a Trade or Business and Involuntary Conversions From Other Than Casualty or Theft--Property Held More Than 1 Year, petitioners reported, inter alia, a "28% Rate" loss of $21,749 attributable to Kildare Timmy.

In Part II of petitioners' 1998 Form 4797, Ordinary Gains and Losses, petitioners claimed, inter alia, a loss of $11,541. In an explanatory statement attached to that form, petitioners claimed that such claimed ordinary loss was attributable to, inter alia, Mr. Ramsburg's sole proprietorship's sale of nine of

---

[14]Keller Bruner prepared petitioners' 1998 return.

the racing and breeding horses that Kildare Timmy distributed to him.  In that explanatory statement, petitioners claimed the following, inter alia, with respect to the sale of those nine horses:

ORDINARY GAINS AND LOSSES

| Description | Date acquired | Date sold | Sales price | Cost or basis | Gain or (loss) |
|---|---|---|---|---|---|
| Idealists Hanover | 01/01/98 | 04/01/98 | $2,500 | $4,339 | ($1,839) |
| Brief Wars | 01/01/98 | 11/01/98 | 12,750 | [1]10,621 | 2,129 |
| Western Skylark | 01/01/98 | 11/01/98 | 5,000 | [1]4,871 | 129 |
| Rare Guy | 01/01/98 | 11/01/98 | 1,500 | [1]5,279 | (3,779) |
| Overture Siera | 01/01/98 | 06/01/98 | 0 | 3,319 | (3,319) |
| Happening Hanover | 01/01/98 | 05/01/98 | 1,000 | 3,883 | (2,883) |
| Yankee Skylark | 01/01/98 | 11/01/98 | 1,200 | [1]1 | 1,199 |
| Overture Hanover | 01/01/98 | 06/01/98 | 0 | 911 | (911) |
| Vidalita Hanover | 01/01/98 | 06/01/98 | 1,616 | 3,883 | (2,267) |
| Total to Form 4797, Part II, Line 10 | | | 25,566 | 37,107 | (11,541) |

[1]There is an unexplained discrepancy between the cost or basis that petitioners claimed in petitioners' 1998 return with respect to each of the four horses Brief Wars, Western Skylark, Rare Guy, and Yankee Skylark that Kildare Timmy distributed to Mr. Ramsburg and the amount that Kildare Timmy reported in its 1998 partnership return as the gross sales price for which it allegedly sold each such horse to Mr. Ramsburg.  It is petitioners' position that Mr. Ramsburg purchased each of the above-referenced horses from Kildare Timmy for a price equal to Kildare Timmy's adjusted basis in each such horse as reflected in Kildare Timmy's books and records.  Thus, under petitioners' position, Mr. Ramsburg's cost or basis in each of the four horses in question on the date on which Kildare Timmy distributed those horses to him should have been equal to the price that he claimed he paid for each such horse.  However, Kildare Timmy reported in its 1998 partnership return the following gross sales price, and petitioners reported in their 1998 return the following cost or basis, with respect to each of those horses:

| Horses | Gross sales price reported in 1998 partnership return | Cost or basis reported in petitioners' 1998 return |
|---|---|---|
| Brief Wars | $2,121 | $10,621 |
| Western Skylark | 2,202 | 4,871 |
| Rare Guy | 5,029 | 5,279 |
| Yankee Skylark | 0 | 1 |

Thus, in petitioners' 1998 return, petitioners claimed a significantly higher cost or basis in each of Brief Wars and Western Skylark and a higher cost or basis in each of Rare Guy and Yankee Skylark than the gross sales price that Kildare Timmy claimed in its 1998 partnership return it received for each such horse.

At the bottom of petitioners' 1998 Form 4797, petitioners indicated that the ordinary loss of $11,541 claimed in that form was attributable to the "ENTIRE DISP OF PAS ACT" conducted by Kildare Timmy.

On May 17, 1999, petitioners jointly filed Form 1045, Application for Tentative Refund (Form 1045), for each of the taxable years 1996 and 1997, in which they claimed refunds based on an alleged NOL for 1998 that they carried back from that year to each of those earlier years. The claimed NOL for 1998 was attributable to petitioners' having treated as nonpassive losses in petitioners' 1998 return petitioners' passive losses (i.e., ordinary passive losses and petitioners' section 1231 passive losses)[15] attributable to Kildare Timmy. Form 1045 showed the following:

|  | 2d preceding tax year ended 1996 | | 1st preceding tax year ended 1997 | |
| --- | --- | --- | --- | --- |
|  | Before carryback | After carryback | Before carryback | After carryback |
| Adjusted gross income from tax return or as previously adjusted | $369,867 | $369,867 | $402,727 | $402,727 |
| Net operating loss deduction after carryback | 0 | 360,918 | 0 | 124,219 |
| Deductions | 133,168 | 133,168 | 316,113 | 316,113 |
| Taxable income | 236,699 | (124,219) | 86,614 | (37,605) |
| Income tax | 69,543 | 0 | 18,899 | 0 |
| Total tax liability | 69,543 | 0 | 18,899 | 0 |

Form 1045 also showed decreases of $69,543 and $18,899 in peti-

---

[15]The parties stipulated that the respective amounts of ordinary passive losses and sec. 1231 passive losses that petitioners claimed were attributable to Kildare Timmy were incorrect and stipulated the correct amount of each such loss.

tioners' total tax liabilities for their taxable years 1996 and 1997, respectively.

At a time not disclosed by the record, petitioners jointly filed Form 1040 for their taxable year 1999 (petitioners' 1999 return). That return included Form 4797 (petitioners' 1999 Form 4797). In Part II of that form, Ordinary Gains and Losses, petitioners claimed an ordinary gain of $89,471. In an explanatory statement attached to petitioners' 1999 Form 4797, petitioners claimed that that ordinary gain was attributable to, inter alia, the sale of three of the racing and breeding horses that Kildare Timmy distributed to Mr. Ramsburg. Petitioners claimed the following with respect to the sale of those three horses:[16]

| Horse | Date acquired | Date sold | Sales Price | Cost or basis | Gain or (loss) |
|---|---|---|---|---|---|
| J R Ramsburg Stables | 01/01/98 | 06/04/99 | $3,585 | $7,090 | ($2,067) |
| J R Ramsburg Stables | 01/01/98 | 11/05/99 | 61,050 | 2,655 | 58,933 |
| J R Ramsburg Stables | 01/01/98 | 11/05/99 | 32,457 | 2,705 | 30,301 |
| Total to be included in Form 4797, Part II, Line 10 | | | $97,092 | $12,450 | $87,167 |

At a time not disclosed by the record, petitioners jointly filed Form 1040 for their taxable year 2002 (petitioners' 2002

---

[16]Although petitioners' 1999 return did not provide the names of the three horses that Mr. Ramsburg sold, the cost or basis of each of those horses that was reported in petitioners' 1999 return (i.e., $7,090, $2,655, and $2,705) is the same as the gross sales price that was reported in Kildare Timmy's 1998 partnership return with respect to each of the horses Bar B Wars, Justen's Western, and Western Shuffle that Kildare Timmy distributed to Mr. Ramsburg on Jan. 1, 1998, and that petitioners claim Kildare Timmy sold to Mr. Ramsburg on that date.

return).[17]  Petitioners' 2002 return included Form 4797 (petitioners' 2002 Form 4797).  In Form 4797, Part I, petitioners reported, inter alia, a loss of $102,281.  In an explanatory statement to petitioners' 2002 Form 4797, petitioners claimed that that loss was attributable to, inter alia, the sale of two of the racing and breeding horses that Kildare Timmy distributed to Mr. Ramsburg.  In that explanatory statement, petitioners claimed the following with respect to the sale of those two horses:

| Horse | Date acquired | Date sold | Sales price | Depreciation | Cost or basis | Gain or (loss) |
|---|---|---|---|---|---|---|
| Northern Crush | 01/01/98 | 01/02/02 | $0 | $4,439 | $7,017 | ($2,578) |
| Tarport Reactor | 01/01/98 | 12/11/02 | 368 | 2,158 | 3,411 | (885) |

In Part III of petitioners' 2002 Form 4797, Gain From Disposition of Property Under Sections 1245, 1250, 1252, 1254, and 1255, petitioners also claimed the following with respect to a horse named Yankee Bardot:

| Date acquired | Date sold | Gross sales price | Cost or other basis plus expense of sale | Depreciation allowed or allowable | Adjusted basis | Total gain |
|---|---|---|---|---|---|---|
| 01/01/98 | 07/31/02 | $1,200 | $398 | $253 | $145 | $1,055 |

Respondent issued to petitioners a notice for their taxable years 1996, 1997, and 1998.  In the notice, respondent, inter alia, disallowed petitioners' claimed nonpassive losses.[18]  The

[17]The record does not contain any tax return of petitioners for 2000 or 2001.

[18]Petitioners' claimed nonpassive losses included petitioners' ordinary passive losses and petitioners' sec. 1231 passive
(continued...)

notice provided in pertinent part:

> (a) As a result of adjustments in 1998, you do not have a net operating loss carryback in 1996 and 1997. Therefore, taxable income is increased $360,919 and $124,219 for 1996 and 1997 respectively.
>
> (b), (c) t is determined that the losses claimed in the amounts of $784,668[19] on Schedule E and $21,749[20] on Form 4797 for the disposition of Kildare Timmy partnership is not allowed. You have not established that you are entitled to the loss. [Reproduced literally.]

## OPINION

### Burden of Proof

Petitioners bear the burden of proving that the determinations in the notice are erroneous.[21] See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

### The Court's Evaluation of Evidence in the Record on Which Petitioners Rely

Petitioners have attempted to satisfy their burden of proof in this case through certain testimonial and documentary evidence.

---

[18](...continued) losses. See supra note 3.

[19]See supra note 15.

[20]See supra note 15.

[21]The parties do not address the application of sec. 7491(a) in the instant case. In any event, on the record before us, we find that petitioners did not introduce credible evidence with respect to the factual issues presented. On that record, we further find that petitioners have failed to carry their burden of establishing that they satisfied the applicable requirements of sec. 7491(a)(2). Under such circumstances, we conclude that the burden of proof does not shift to respondent under sec. 7491(a) with respect to the factual issues presented.

Testimonial Evidence

At the trial in this case, petitioners called Mr. Ramsburg, Mr. Stottlemeyer, and Mr. Rippeon as witnesses. With respect to the testimony of Mr. Ramsburg, we did not find him to be credible. In addition, we found Mr. Ramsburg's testimony to be evasive, uncorroborated, and/or self-serving in certain material respects. We shall not rely on such testimony of Mr. Ramsburg to establish petitioners' position in this case.

With respect to the testimony of Mr. Stottlemeyer, we found his testimony to be implausible, questionable, vague, conclusory, and/or uncorroborated in certain material respects. We also found Mr. Stottlemeyer's testimony to serve in certain material respects the interests of Mr. Ramsburg, who was Mr. Stottlemeyer's longtime friend from childhood and the owner of Frederick Underwriters, Mr. Stottlemeyer's employer, and who gave Mr. Stottlemeyer the opportunity to be his partner in Kildare Timmy. We shall not rely on such testimony of Mr. Stottlemeyer to establish petitioners' position in this case.

With respect to the testimony of Mr. Rippeon, one of the certified public accountants employed by Keller Bruner to prepare petitioners' returns for the years at issue, Kildare Timmy's partnership returns, and the Keller Bruner checklists utilized in preparing such partnership returns, Mr. Rippeon had no personal knowledge about any of the underlying facts with respect to the

matters reported in those returns and checklists.  Instead, Mr.
Rippeon relied on representations and documents that Mr. Ramsburg
and/or Mr. Stottlemeyer provided to him.  We shall not rely on
Mr. Rippeon's testimony about any of the underlying facts with
respect to the matters reported in the returns and checklists in
question to establish petitioners' position in this case.

Documentary Evidence

The record contains various documents on which petitioners
rely that were prepared, and/or that contained information
supplied, by Mr. Ramsburg and/or Mr. Stottlemeyer.[22]  We shall
not rely on such documents to establish petitioners' position in
this case.

Section 469(g)(1)

We must decide whether section 469(g)(1)[23] permits petition-

---

[22]The documents on which petitioners rely included certain
tax returns of petitioners and Kildare Timmy, respectively.  A
tax return is merely a statement of the claim of the person
filing such return and does not establish the truth of the
matters set forth therein.  See, e.g., Wilkinson v. Commissioner,
71 T.C. 633, 639 (1979).

[23]Sec. 469(g)(1) provides in pertinent part:

SEC. 469.  PASSIVE ACTIVITY LOSSES AND CREDITS LIMITED.

*       *       *       *       *       *       *

(g) Dispositions of Entire Interest in Passive
Activity.--If during the taxable year a taxpayer dis-
poses of his entire interest in any passive activity
(or former passive activity), the following rules shall
apply:

(continued...)

ers to treat for 1998 petitioners' passive losses attributable to Kildare Timmy as nonpassive losses.  It is petitioners' position that section 469(g)(1) allows such treatment.  Respondent disagrees.

In support of petitioners' position, petitioners argue that Mr. Ramsburg

> disposed of his entire interest in the activity of the Kildare Timmy partnership in a transaction in which gain or loss was recognized, as required by §469(g)(1)
> * * *

---

[23](...continued)

> (1) Fully Taxable Transaction.--
>
> (A) In general.--If all gain or loss realized on such disposition is recognized, the excess of--
>
> (i) any loss from such activity for such taxable year (determined after the application of subsection (b)), over
>
> (ii) any net income or gain for such taxable year from all other passive activities (determined after the application of subsection (b)),
>
> shall be treated as a loss which is not from a passive activity.
>
> (B) Subparagraph (A) not to apply to disposition involving related party.--If the taxpayer and the person acquiring the interest bear a relationship to each other described in section 267(b) or section 707(b)(1), then subparagraph (A) shall not apply to any loss of the taxpayer until the taxable year in which such interest is acquired (in a transaction described in subparagraph (A)) by another person who does not bear such a relationship to the taxpayer.

The transaction in which gain or loss was recognized was the taxable liquidation of the Kildare Timmy partnership. The liquidation was fully taxable because the only property distributed in liquidation was money. * * * As a result, the Petitioners incurred a loss on the disposition of Jacob R. Ramsburg, Jr.'s interest in the Kildare Timmy partnership in the amount of $69,772. * * *

Provided that the Tax Court finds that the sale of the horses from the partnership to Mr. Ramsburg was a sale for tax purposes, it is clear that the liquidation of the partnership, involving the distribution of only money, was a fully taxable transaction under §731 of the Code. Section 731(a) of the Code provides that gain or loss is recognized in the case of a liquidating distribution by a partnership to a partner which only consists of money. Any gain or loss recognized pursuant to §731(a) of the Code is "considered as gain or loss from the sale or exchange of the partnership interest of the distributee partner." I.R.C. §731(a) * * *.

With regard to the [sic] Mr. Ramsburg's purchase of the horses from the Kildare Timmy partnership, Mr. Ramsburg and Mr. Stottlemeyer were dealing at arms' length. The evidence indicates that, at the time the sale of the horses was agreed to, each owned 50% of the capital interest of the partnership. * * * Specifically, the form of the transaction was structured as a sale, the transaction was accounted for on the 1998 partnership return and the Petitioners' 1998 individual tax return as a sale, both of which were prepared by Petitioners' certified public accountants. * * *

With respect to Kildare Timmy's claimed sale of its horses to Mr. Ramsburg, petitioners contend:

the evidence establishes that [petitioner] Jacob R. Ramsburg, Jr. purchased the horses[24] from the Kildare

---

[24]Although not altogether clear, it appears that, when petitioners contend that Mr. Ramsburg purchased the "horses" from Kildare Timmy, petitioners intend to include in their reference to the "horses" not only Kildare Timmy's racing and breeding horses but also its stud rights, and we so assume hereinafter.

(continued...)

Timmy partnership at book value prior to the liquidation of the partnership and that, as a result, the only assets distributed to Mr. Ramsburg in liquidation of the partnership consisted of the remaining balance in the partnership checking account [Kildare Timmy bank account balance] and the proceeds from the partnership's sale of the horses to Mr. Ramsburg.  Under §731(a)(2) of the Code, Petitioners therefore recognized a loss on the distribution of the cash balance of the checking account and the proceeds from the sale of the horses.  The fact that the fair market value of the horses owned by the Kildare Timmy partnership was not precisely determined does not change the fact that Mr. Ramsburg recognized a loss on the receipt of the liquidating distribution from the partnership. * * * Mr. Stottlemeyer effectively received, in liquidation of the partnership, a credit equal to his 50% share of the assets of the partnership against his liability to Mr. Ramsburg in the amount of $146,750.

In support of respondent's position that section 469(g)(1) does not permit petitioners to treat for 1998 petitioners' passive losses attributable to Kildare Timmy as nonpassive losses, respondent argues:

a taxpayer who disposes of an interest in a passive activity may deduct suspended losses only if three conditions are satisfied:  (1) the taxpayer disposes of his entire interest in the activity; (2) the disposition is in the form of a fully taxable transaction (i.e., one in which the full amount of the gain or loss inherent in the activity is recognized); and (3) the person acquiring the interest is not related to the taxpayer.  I.R.C. § 469(g).  The petitioners failed to satisfy any of these conditions.

According to respondent,

---

[24](...continued)
If petitioners do not intend to include Kildare Timmy's stud rights in their reference to the "horses" that Mr. Ramsburg allegedly purchased from Kildare Timmy, petitioners must concede that Kildare Timmy distributed to Mr. Ramsburg not only money but also such stud rights in liquidation of his interest in that partnership.

petitioners are not entitled to claim the suspended passive activity losses because they have not established that they (1) disposed of their entire interest (2) in a fully taxable transaction (3) to an unrelated party.

Indeed the evidence established that petitioners maintained and increased their interest in the passive activity. Moreover, petitioner failed to establish that the liquidating distribution petitioner received when the partnership terminated required recognition of either gain or loss under the provisions of I.R.C. § 731. Finally, the liquidating distribution petitioner received from the partnership was between related parties within the provisions of I.R.C. § 469(g)(1)(B).

We need not decide whether respondent is correct in arguing that petitioners have not established that Mr. Ramsburg (1) did not dispose of his entire interest in the passive activity in question (2) to an unrelated party. Even if we were to reject such contentions of respondent, on the record before us, we nonetheless would, and do, find that petitioners have failed to carry their burden of showing that section 469(g)(1) permits them to treat for 1998 petitioners' passive losses attributable to Kildare Timmy as nonpassive losses. That is because on that record we find that petitioners have failed to carry their burden of establishing that, as required by section 469(g)(1)(A), they recognized under section 731 all of the gain or all of the loss, as the case may be, realized when Mr. Ramsburg received from Kildare Timmy a distribution in liquidation of his interest in that partnership.

It is petitioners' position that the distribution in liqui-

dation of Mr. Ramsburg's interest in Kildare Timmy that that partnership made to him on January 1, 1998, "was a fully taxable transaction under §731". That is because, according to petitioners, "the only property distributed in [that] liquidation was money." Petitioners acknowledge on brief that the linchpin in their position under section 731, and thus in their position under section 469(g)(1)(A), is the Court's acceptance of their contention that the alleged "sale of the horses from the partnership to Mr. Ramsburg was a sale for tax purposes". We thus turn to petitioners' contention that Mr. Ramsburg purchased Kildare Timmy's racing and breeding horses and stud rights for their respective book values.

On the record before us, we find that petitioners have failed to show that, in form or in substance, Mr. Ramsburg purchased Kildare Timmy's racing and breeding horses and stud rights on January 1, 1998, immediately before that partnership made a distribution of assets to him in liquidation of his interest in that partnership. No money changed hands from Mr. Ramsburg to Kildare Timmy when he allegedly purchased the horses and the stud rights in question; nor did any money change hands from Kildare Timmy to Mr. Ramsburg when that partnership allegedly distributed the proceeds from such alleged sale to Mr. Ramsburg in liquidation of his interest in that partnership.[25]

_____

[25]The only money distributed by Kildare Timmy to Mr.
(continued...)

Petitioners claim that no money needed to change hands between Kildare Timmy and Mr. Ramsburg because the money that Mr. Ramsburg allegedly paid to Kildare Timmy to purchase the horses and the stud rights in question would have been immediately distributed by Kildare Timmy to Mr. Ramsburg in liquidation of his interest in that partnership. On the record before us, we reject petitioners' self-serving claim. Petitioners, in effect, ask us to accept their contention that Mr. Ramsburg purchased Kildare Timmy's racing and breeding horses and stud rights because that is what Mr. Ramsburg told (1) Mr. Stottlemeyer, his longtime friend and partner, (2) Mr. Rippeon, his accountant who prepared Kildare Timmy's 1998 partnership return and petitioners' 1998 return, and (3) the Court at the trial in this case. As stated above, we are unwilling to rely on the testimony of Mr. Ramsburg, Mr. Stottlemeyer, and Mr. Rippeon to establish petitioners' position in this case. We also are unwilling to rely on documents in the record that were prepared, and/or that contained information supplied, by Mr. Ramsburg and/or Mr. Stottlemeyer, such as Kildare Timmy's 1998 partnership return in which that partnership claimed to have sold to Mr. Ramsburg its racing and breeding horses and stud rights for their respective book values.

Based upon our examination of the entire record before us,

_____

[25](...continued)
Ramsburg in liquidation of his interest in that partnership was the Kildare Timmy bank account balance.

we find that petitioners have failed to carry their burden of establishing that Mr. Ramsburg purchased from Kildare Timmy on January 1, 1998, its racing and breeding horses and stud rights. On that record, we further find that petitioners have failed to carry their burden of establishing that Mr. Ramsburg received only money from Kildare Timmy in liquidation of his interest in that partnership. On the record before us, we find that on January 1, 1998, Kildare Timmy distributed to Mr. Ramsburg in liquidation of his interest in that partnership not only money (i.e., the Kildare Timmy bank account balance) but also its racing and breeding horses and stud rights.[26]

---

[26]On the record before us, we also find that petitioners have failed to carry their burden of establishing that on Jan. 1, 1998, Mr. Stottlemeyer "effectively received [from Kildare Timmy], in liquidation of the partnership, a credit equal to his 50% share of the assets of the partnership against his liability to Mr. Ramsburg [under Mr. Stottlemeyer's note] in the amount of $146,750." In addition, Mr. Stottlemeyer's note that he signed on Dec. 31, 1994, provided that Mr. Stottlemeyer promised to pay to Mr. Ramsburg the "lesser of my [Mr. Stottlemeyer's] share of cash proceeds from [the] disposition of horses owned by the entity known as Kildare Timmy or the sum of one hundred fourty [sic] six thousand seven hundred and fifty Dollars * * * with interest * * * at the rate of 0% per annum." Mr. Stottlemeyer's note did not specify any date(s) on which Mr. Stottlemeyer was to make any payment(s) thereunder. On the record before us, we find that petitioners have failed to carry their burden of establishing that there was a loan by Mr. Ramsburg to Mr. Stottlemeyer that was evidenced by Mr. Stottlemeyer's note. See, e.g., Haag v. Commissioner, 88 T.C. 604, 616 n.6 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988). Assuming arguendo that petitioners had carried their burden of establishing that there was a loan by Mr. Ramsburg to Mr. Stottlemeyer that was evidenced by Mr. Stottlemeyer's note, we have found that there was no sale by Kildare Timmy to Mr. Ramsburg of its horses and stud rights. As a result, there were no "cash proceeds from

(continued...)

Having rejected the linchpin in petitioners' position under section 469(g)(1)(A) (viz., Mr. Ramsburg purchased from Kildare Timmy its horses and stud rights immediately before Kildare Timmy made a distribution to him in liquidation of his interest in that partnership), we shall now analyze whether, as required by section 469(g)(1)(A), petitioners recognized all of the gain or all of the loss, as the case may be, realized upon the distribution by Kildare Timmy to Mr. Ramsburg of Kildare Timmy's horses and stud rights and Kildare Timmy's bank account balance.

Section 731(a) provides:

SEC. 731. EXTENT OF RECOGNITION OF GAIN OR LOSS ON DISTRIBUTION.

(a) Partners.--In the case of a distribution by a partnership to a partner--

(1) gain shall not be recognized to such partner, except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution, and

(2) loss shall not be recognized to such partner, except that upon a distribution in liquidation of a partner's interest in a partnership where no property other than that described in subparagraph (A) or (B) is distributed to such partner, loss shall be recognized to the extent of the excess of the adjusted basis of such partner's interest in the partnership over the sum of--

(A) any money distributed, and

---

26(...continued)
[the] disposition of horses owned by * * * Kildare Timmy". Consequently, pursuant to the terms of Mr. Stottlemeyer's note, Mr. Stottlemeyer did not owe Mr. Ramsburg anything.

(B) the basis to the distributee, as determined under section 732, of any unrealized receivables (as defined in section 751(c)) and inventory (as defined in section 751(d)).

On the record before us, we find that petitioners have failed to carry their burden of establishing (1) Mr. Ramsburg's adjusted basis in his interest in Kildare Timmy[27] and (2) the fair market value of each of the noncash assets (i.e., the racing and breeding horses and the stud rights) that Kildare Timmy distributed to Mr. Ramsburg in liquidation of his interest in that partnership. On that record, we further find that petitioners have failed to carry their burden of showing whether the total of (1) the Kildare Timmy bank account balance of $908.71 and (2) the aggregate of the respective fair market values of the racing and breeding horses and the stud rights that we have found Kildare Timmy distributed to Mr. Ramsburg in liquidation of his interest in that partnership was equal to, greater than, or less than Mr. Ramsburg's adjusted basis in such partnership interest. As a result, we find that petitioners have failed to carry their burden of showing (1) whether Mr. Ramsburg realized a gain or a loss upon Kildare Timmy's distribution to him of the horses, stud rights, and bank account balance in question and (2) whether all

---

[27]Respondent appears to take the position, with no explanation, that Mr. Ramsburg's adjusted basis in his interest in Kildare Timmy was $139,569 (before taking into account Kildare Timmy's $4,592 loss from trade or business activities that it claimed in its 1998 partnership return and that it reported in that return as Mr. Ramsburg's distributive share of such loss).

of any such gain or all of any such loss, as the case may be, was to be recognized under section 731(a).[28]  Assuming arguendo that

---

[28]We seriously doubt that sec. 731(a) required petitioners to recognize all of any gain or all of any loss, as the case may be, realized upon Kildare Timmy's distribution to Mr. Ramsburg of the horses, stud rights, and bank account balance in question. It is significant that if there were a gain realized upon such distribution, the assets that Kildare Timmy distributed to Mr. Ramsburg included not only money but Kildare Timmy's racing and breeding horses and stud rights.  Under sec. 731(a), gain is not to be recognized except to the extent that any money distributed exceeds the adjusted basis of the partner's interest in the partnership immediately before the distribution.  If there were a loss realized upon the distribution by Kildare Timmy to Mr. Ramsburg of the horses, stud rights, and bank account balance in question, sec. 731(a)(2) provides that loss is not to be recognized except that, upon a distribution in liquidation of a partner's interest in a partnership, where no property is distributed other than money, unrealized receivables as defined in sec. 751(c), and inventory as defined in sec. 751(d), loss is to be recognized to the extent of the excess of the adjusted basis of the partner's interest in the partnership over the sum of (1) any money distributed and (2) the basis to the distributee, as determined under sec. 732, of any such unrealized receivables and any such inventory.  In this connection, for purposes of sec. 731(a)(2), each of Kildare Timmy's racing and breeding horses and its stud rights may constitute an unrealized receivable as defined in sec. 751(c), but only to the extent of the amount to be treated as gain to which sec. 1245(a) would apply if at the time Kildare Timmy distributed each such asset to Mr. Ramsburg, that partnership had sold each such asset at its fair market value.  See secs. 731(a)(2)(B), 751(c).  Thus, for purposes of sec. 731(a)(2), any determination of whether Kildare Timmy distributed "unrealized receivables" to Mr. Ramsburg depends on Kildare Timmy's basis in and the fair market value of each such horse and stud rights.  Even if there were any sec. 1245(a) gain associated with any of Kildare Timmy's horses or stud rights, none of any loss realized by Mr. Ramsburg upon the distribution to him by Kildare Timmy of the horses, stud rights, and bank account balance in question would be recognized under sec. 731(a)(2).  That is because a distribution of an unrealized receivable in the form of sec. 1245(a) gain necessarily involves the distribution of the underlying asset (i.e., each of the horses and the stud rights in question) to which the sec. 1245(a) gain attaches.  Therefore, the distribution in liquidation of Mr.
(continued...)

we had found that Mr. Ramsburg disposed of his entire interest in the passive activity in question to an unrelated person, on the record before us, we find that petitioners have failed to carry their burden of establishing that, as required by section 469(g)(1)(A), they recognized all of any gain or all of any loss, as the case may be, realized upon any such disposition.

Based upon our examination of the entire record before us, we find that section 469(g)(1) does not permit petitioners to treat for 1998 petitioners' passive losses attributable to Kildare Timmy as nonpassive losses.

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.[29]

---

[28](...continued)
Ramsburg's interest in Kildare Timmy would have included property other than money, unrealized receivables, and inventory. See sec. 731(a)(2). Moreover, if any of Kildare Timmy's horses or stud rights that it distributed in liquidation of Mr. Ramsburg's interest in that partnership were not to have any sec. 1245(a) gain associated with it, none of any loss realized by Mr. Ramsburg upon that distribution would be recognized under sec. 731(a)(2). That is because the distribution in liquidation of Mr. Ramsburg's interest in Kildare Timmy would have included property other than money, unrealized receivables, and inventory. See sec. 731(a)(2).

[29]We shall, however, address petitioners' contention that on Jan. 1, 1998, the date on which we have found Kildare Timmy distributed to Mr. Ramsburg its horses and stud rights and the Kildare Timmy bank account balance, Mr. Stottlemeyer owned a 50-percent capital interest in Kildare Timmy. In support of that contention, petitioners assert, inter alia, that, in addition to cash, Mr. Stottlemeyer made capital contributions to Kildare Timmy of Mr. Stottlemeyer's management services. On the record
(continued...)

To reflect the foregoing,

Decision will be entered

for respondent.

---

[29](...continued)
before us, we reject petitioners' contention that Mr.
Stottlemeyer owned a 50-percent capital interest in Kildare Timmy
on Jan. 1, 1998.  In this regard, we have found that (1) Mr.
Ramsburg and Mr. Stottlemeyer made cash capital contributions to
Kildare Timmy totaling around $1,336,459 and $282,187, respec-
tively, (2) in return for Mr. Stottlemeyer's management services,
Mr. Stottlemeyer did not receive any salary from Kildare Timmy or
increases in his Kildare Timmy capital account, and (3) on Jan.
1, 1998, Kildare Timmy distributed all of its assets (i.e., the
racing and breeding horses, the stud rights, and the Kildare
Timmy bank account balance) to Mr. Ramsburg and distributed none
of its assets to Mr. Stottlemeyer.